UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| OOO "GARANT-S," | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 11 Civ. 1324 (FB)(LB) |
| | ) | |
| EMPIRE UNITED LINES CO., INC., *ET AL.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The plaintiff, OOO "Garant-S" (hereinafter referred to as "Plaintiff"), by and through the

undersigned counsel, submits this memorandum in opposition to the motion for partial summary

judgment of defendants Michael Khitrinov (aka "Michael Hitrinov," hereinafter referred to as

"Hitrinov") and Empire United Lines Co., Inc. (hereinafter referred to as "Empire"), respectfully

asks the Court to deny said motion in its entirety, and for cause states as follows

### Introduction

By way of introduction, it is necessary to say what the defendants' motion for summary

judgment is and what it is not.

As the defendants candidly state, theirs is a motion for <u>partial</u> summary judgment, not a

motion for full summary judgment (except that the defendants also make a jurisdictional

argument that, if it had merit (and it has none), could end the action in this Court, albeit without

prejudice).

As to defendant Empire, the defendants do not attack any of Plaintiff's claims as such.

Instead, they are asking that the Court enter an order limiting Plaintiff's recovery, should it

prevail, to $1,000.00, pursuant to the Carriage of Goods by Sea Act, 46 U.S.C. § 30701 *et seq.*

(hereinafter referred to as "COGSA"), defendant Empire's bill of lading, and/or defendant Empire's published tariff.

As to defendant Hitrinov, the defendants are asking for summary judgment in his favor because, they claim, at all relevant times, he was acting as an agent of defendant Empire and defendant Empire is a New York corporation.

The defendants also contend that the amount in controversy is below $75,000, wherefore this case is outside the diversity jurisdiction of this Court.

The defendants are not asking the Court to enter summary judgment to the effect that defendant Empire did not breach contract, was not negligent or grossly negligent, did not commit or participate in wrongful taking, conversion, fraud, and misrepresentation, and was not unjustly enriched.

Plaintiff submits that all of the defendants' contentions are without merit and their motion for partial summary judgment should be denied.

## Applicable Standard

Summary judgment shall be granted if "there is not genuine issue as to any material fact" such that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. O. 56(c). A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the nonmoving party. *Holtz v. Rockefeller & Co.*, 258 F.3d 62 (2d Cir. 2001). In deciding a motion for summary judgment, the Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in the light most favorable to the party opposing the motion." *Cifarelli v. Babylon*, 93 F.3d 47 (2d Cir. 1996), and does not make any credibility assessments or weigh the evidence, *Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996).

**Factual Background**

This case concerns two BMW vehicles.

Plaintiff is a Russian company that is in the business of buying and selling automobiles. In late 2010, it bought at auctions in the United States two expensive BMWs, VIN numbers 5UXFE43527L015231 and 5UXFE43587L014892. Plaintiff intended to ship the two vehicles to the Russian Federation to resell them there for a considerable profit. Plaintiff estimates that the reasonable market value of the two vehicles was at least $80,000.00. (Ex. 1, Aff. Lanchinskiy ¶¶ 5, 7-8.)

Empire is a New York company, wholly owned and controlled by Hitrinov. It is Hitrinov's *alter ego*. Empire has no officers or directors other than Hitrinov. (*See* Ex. 2, Tr. Dep. Hitrinov at 90-105.) Hitrinov and Empire are in the business of arranging storage and ocean transportation of motor vehicles to destinations overseas for customers. They operate a storage facility in Port Elizabeth, New Jersey. (Aff. Hitrinov ¶¶ 3, 6.)

Plaintiff had been using the defendants' services for shipment of vehicles overseas for a few years prior to November of 2010. (Aff. Hitrinov ¶ 7; Ex. 1, Aff. Lanchinskiy ¶ 9.)

Plaintiff arranged for the two BMW vehicles to be delivered to the defendants' storage facility in Port Elizabeth. The two vehicles were, indeed, delivered to that facility. (Aff. Hitrinov, Ex. 1, Aff. Lanchinskiy ¶ 11.)

At around the same time, two expensive Mercedes vehicles were delivered to the defendants' facility in Port Elizabeth, New Jersey. The two vehicles belonged to two other entities that are in the business of buying and selling vehicles. (Aff. Hitrinov, Ex. 9.)

The four vehicles were placed at a location on the parking lot from which they could be stolen with the greatest ease. The barrier on the neighboring lot has a gap through which the vehicles could be driven out. (Aff. Lanchinskiy ¶ 12.)

Keys for the vehicles were delivered to the defendants and received by the defendants. No keys were delivered to any other persons. (Ex. 1, Aff. Lanchinskiy ¶ 13.)

On November 8, 2010, at night or early in the morning, a group of individuals removed the four vehicles, including the defendants' two BMWs from the defendants' lot. The individuals used keys to enter the vehicles. The individuals drove the vehicles out through a hole in the fence. The individuals drove out two vehicles. After a considerable time, perhaps as much as one hour, they returned and drove out two more vehicles. The vehicles were never returned. No effort was made by anyone to interfere with this operation. (Aff. Hitrinov, Ex. 9, Investigation Report: "two suspects walking thru the lot were it appeared they deactivated alarm with veh keys … drove through the [hole] in the fence. Same suspects came back 1 hour later and took the BMW truck.")

Over the next few days, defendant Hitrinov filed police reports regarding the theft of the vehicles. (Aff. Hitrinov ¶ 25 and Ex. 9.)

However, defendant Hitrinov did not inform Plaintiff of the theft. When Plaintiff called to inquire about the vehicles, defendant Hitrinov stonewalled, lied, and concealed the theft. Having conversations with Hitrinov became impossible. Hitrinov demanded that Plaintiff prove that the vehicles had been delivered to him even though he knew the vehicles had been delivered. Later, he told Plaintiff not to pay the motor carriers for the vehicles' transportation from auction to the defendants' lot (Plaintiff eventually paid them anyway). Employees and agents of Empire were instructed not to discuss the event. (Aff. Lanchinskiy ¶ ¶ 15 *et seq.*.)

4

Hitrinov misinformed Port Elizabeth law enforcement about the ownership of the vehicles, claiming himself to be the owner and not once identifying the actual owners, even though he knew who owned the vehicles. (Aff. Hitrinov, Ex. 9; *compare* Ex. 2, Tr. Dp. Hitrinov.)

Hitrinov did the same to the other victims of the November heist. (*See, e.g.*, Aff. Hitrinov, Ex. 9: "On 12-1-10 [nearly one month after the theft!]… July Markov, a representative of U.S. Auto Network … came … to report his [company's] vehicle had been stolen.") He demanded that one of the victims produce a title to the stolen vehicle. When the owner did produce the title, Hitrinov deemed that, per his deposition testimony, an unfortunate turn of events. (Ex. 2, Tr. Dep. Hitrinov at 198-201.)

It took Hitrinov a considerable period of time to disclose the theft of the second vehicle. (Aff. Lanchinskiy ¶ 22.)

Notably, Hitrinov never returned the keys to the vehicles to Plaintiff. (Aff. Lanchinskiy 23.) When asked about the keys during his deposition, Hitrinov lied that he had returned them to Plaintiff. (Ex. 2, Tr. Dep. Hitrinov184-189 *et seq.*)

The two vehicles were equipped with electronic anti-theft tracking devices. Had Plaintiff been informed of the theft immediately, the vehicles could have been tracked and recovered. (Aff. Lanchinskiy ¶ 24.)

When, after a delay of several days, Plaintiff learned of the vehicles' disappearance, the tracking system was activated, but it was already too late. To activate the system, Plaintiff needed police reports. Hitrinov did not provide Plaintiff with police reports even though he had filed them and Plaintiff had to travel to New Jersey, wasting even more precious time. (Aff. Lanchinskiy ¶ 26.)

For several months after the theft, Hitrinov represented that he was working on the problem and was trying to get compensation for Plaintiff. When Plaintiff asked whether he had insurance, Hitrinov responded that he was Plaintiff's insurance. On a later occasion, he argued to Plaintiff that even if he had obtained an insurance payout, he did not have to share it with anyone. (Aff. Lanchinskiy ¶ 27.)

No bills of lading or warehouse receipts were ever issued for or with respect to the two vehicles. No voyage was ever booked for the two vehicles. No specific maritime shipping instructions were exchanged with respect to the vehicles. (Aff. Lanchinskiy ¶ 29.)

Plaintiff was never offered any opportunity to declare a higher value for the vehicles or to procure insurance. (Aff. Lanchinskiy 30.) Notably, Plaintiff had availed itself of such opportunity in the past. (Aff. Lanchinskiy 30; Aff. Hitrinov ¶ 18 and Ex. 5.)

Over the course of the parties' dealing, the defendants never informed Plaintiff of any liability limitation. Plaintiff was never shown the backs of the bills of lading and, in fact, usually did not receive any bills of lading from the defendants. Plaintiff had no knowledge of the defendants' published tariff. (Aff. Lanchinskiy ¶¶ 31-33.)

Empire's "master bills of lading" for prior shipments nowhere mention Plaintiff and also indicate that the defendants apparently misinform U.S. Customs of the value of the goods they ship. (Aff. Hitrinov, Ex. 3, "Master Bill of Lading": "NO [SHIPPER'S EXPORT DECLARATION] REQUIRED" for a 2008 Mercedes and a 2009 Toyota Sienna[1].)

Mr. Hitrinov's understanding of the bills of lading is that they are "certain documents giving blah, blah, blah, blah, saying from where to where." (Ex. 2, Tr. Dep. Hitrinov at 109.)

---

[1] Generally an SED is required for shipments over $2,500.

Argument

**1. This matter is within the subject matter jurisdiction of this Court.**

The defendants' argument that this matter is outside the jurisdiction of the Court is without merit.

First of all, throughout their motion, the defendants argue that Plaintiff claims are subject to the Carriage of Goods by Sea Act, 46 U.S.C. § 30701 *et seq.* (hereinafter referred to as "COGSA"). If that were so, they would be maritime claims that fall within the admiralty and maritime jurisdiction of this Court. *See* 28 U.S.C. § 1333[2]. Admiralty and maritime jurisdiction has no "amount in controversy" limitation. Of course, Plaintiff disagrees with the defendants' COGSA arguments, certainly insofar as they suggest a limitation on Plaintiff's potential recovery.

Plaintiff has asserted that this is a diversity of citizenship matter. In a diversity case, the amount in controversy must exceed $75,000. 28 U.S.C. § 1332. The defendants argue that the amount of controversy in the present case does not exceed $75,000, wherefore this case is outside the diversity jurisdiction of the Court. The defendants' argument is based solely on the fact that the two vehicles in question were purchased by Plaintiff at auction for a total of $59,185.00 ($28,710.00 and $30,475.00).

Plaintiff has claimed compensatory damages of not less than $80,000 and punitive damages of not less than $250,000. (Compl.) Plaintiff has consistently maintained that the two vehicles' value was not less $80,000. Plaintiff's U.S. agent, Mr. Lanchinsky, who has many years of experience in the automobile market, and is particularly knowledgeable about the

---

[2] The district court shall have original jurisdiction, exclusive of the courts of the States, of:
    (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.
    (2) ….
28 U.S.C. § 1333.

market for similar vehicles in the Russian Federation[3], has testified accordingly during his deposition. (*See also* Aff. Lanchinsky, Ex. 1, ¶ 8.) Indeed, the total retail value of similar vehicles exceeds $75,000.00. Of note are the investigation and vehicle reports attached as Exhibit 9 to the Affidavit of defendant Hitrinov. Mr. Hitrinov claims that "over the course of the next few days [after November 8, 2010] [he, Michael Hitrinov,] filed separate police reports for each of the four stolen automobiles." (Aff. Hitrinov ¶ 25.) According to the police report that Hitrinov, per his own testimony, filed for the BMW vehicle with VIN number 5UXFE43527L015231 that belonged to Plaintiff, the value of that vehicle alone was $56,225.00. (Aff. Hitrinov, Ex. 9.) It was the pricier of the two vehicles. (Aff. Hitrinov, Ex. 7.) Assuming that the second vehicle was worth only what Plaintiff paid for it (and Plaintiff contends that it was worth more), the aggregate value of the two vehicles was at least $84,935.00. This does not even take into account the other damages suffered by Plaintiff.

Further, Plaintiff has asserted a number of claims that entitle it to recover punitive damages, most notably fraud, conversion, and gross negligence. The defendants' motion does not attack those claims as such (at least as far as defendant Empire is concerned[4]), and only seeks to limit liability pursuant to COGSA, albeit in error, *see infra*. Indeed, as the defendants concede, even breach of contract may entitle Plaintiff to punitive damages, provided there is a "wrong aimed at the public generally" or "an extraordinary showing of a disingenuous or dishonest failure to carry out a contract." (Mem. Supp. Mot. Sum. J. at 12, *quoting Career Initiatives Corp. v. Palmer*, 893 F. Supp. 295. 296 (S.D.N.Y. 1995).) The present case involves exactly that – a bailee and carrier who intentionally harmed his clients. (Compl.; Aff. Lanchinskiy, Ex. 1, generally.)

---

[3] The vehicles were intended to be sold in the Russian Federation.
[4] The defendants contend that defendant Hitrinov is not personally liable.

The amount in controversy clearly exceeds $75,000.00 and this matter is within the diversity jurisdiction of this Court.

## 2. The defendants' liability is not limited to $1,000.00.

The defendants contend that their liability is limited to $1,000.00 by virtue and operation of COGSA, defendant Empire's bill of lading, and/or defendant Empire's published tariff.

As the defendants correctly note, "[t]he first cause of action [pled] by [P]laintiff in its Complaint is for breach of contract." (Mem. Supp. Mot. Sum. J. at 5.) That much is true. The second cause of action pled by Plaintiff is for wrongful taking and conversion, the third and fourth – for fraud and deceit, the fifth – for negligence, but also for gross negligence. (Compl. generally.) Assuming, *arguendo*, that they apply and are relevant, neither COGSA, nor defendant Empire's bill of lading, nor, for that matter, defendant Empire's published tariff can limit the defendants' liability for conversion, fraud, and gross negligence[5].

Further, common law and maritime law have long recognized the doctrine of deviation and quasi-deviation. The doctrine derived partly from the carrier's duty to exercise its best efforts to safely transport the goods and the understanding between the shipper and the carrier that the latter would not stray from the customary course of the voyage it contracted to undertake and expose the cargo to unanticipated risks. *See Vision Air Flight Serv., Inc. v. M/V Nat'l Pride*, 155 F.3d 1165 (9th Cir. 1998). The doctrine of deviation has been broadened to encompass breaches of contract of carriage deemed serious enough to warrant the consequences imposed by deviation. While non-delivery in and of itself may not be a deviation, purposeful misfeasance or malfeasance by the carrier, such as alleged herein, clearly is. *Cf. G.W. Sheldon & Co. v.*

---

[5] Needless to say, they can never exempt them from liability. 46 U.S.C. § 1303(8)

*Hamburg Amerikanishe Packetfahrt-Gesselchaft*, 28 F.2d 249, 252 (3d Cir. 1928) (requiring plaintiff to prove misfeasance in order to abrogate contractual provisions limiting liability).

COGSA, enacted originally in 1936, did not eliminate the doctrine. Rather, it limited the liability of carriers in cases of reasonable deviation, but not in cases of unreasonable deviation. *See* 46 U.S.C. § 1304(4). In one of the first cases decided under COGSA, *Jones v. The Flying Clipper*, 116 F. Supp. 386 (S.D.N.Y. 1953), it was held that the $500 limitation does not apply in the event of an unreasonable deviation, because an unreasonable deviation "so change[s] the essence of the agreement as to effect its abrogation," *The Flying Clipper* at 390. The court reasoned that without such an exception to COGSA's limitation of liability provision, a carrier would be free to "reckless[ly] … violate the terms of [a] bill of lading, knowing that it cannot be called upon to pay more than $500 per package." *The Flying Clipper* at 390. The exception for unreasonable deviation is widely recognized. *See, e.g., Encyclopaedia Britannica, Inc. v. S.S. H.K. Producer*, 422 F.2d 7 (2d Cir. 1969); *see also C.A. La Seguridad v. Delta S.S. Lines*, 721 F.2d 322 (11th Cir. 1983) (an unreasonable deviation nullifies COGSA's limitation of liability), *Gen. Elec. Co. Int'l Sales Div. V. S.S. Nancy Lykes*, 706 F.2d 90 (2d Cir. 1983) (any unreasonable deviation is to be treated as a breach of COGSA and the contract of carriage).

COGSA itself provides that contracts and provisions intended to escape liability for losses arising from negligence, fault, and breach of duty are "null and void and of no effect." 46 U.S.C. § 1303(8); *cf. Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874 (3d Cir. 1992) (a clause that allows any deviation imaginable allows unreasonable deviations and, consistent with COGSA, is not enforceable), *S.S. Nancy Lykes*, 706 F.2d 90 (2d Cir. 1983), *Hellenic Lines, Ltd. v. United States*, 512 F.2d 1196 (2d Cir. 1975).

An unreasonable deviation deprives the carrier of the benefit of COGSA's liability limitation. *Gen. Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes*, 706 F.2d 90 (2d Cir. 1983); *Jones v. The Flying Clipper*, 116 F. Supp. 386 (S.D.N.Y. 1953); *Nemeth v. Gen. S.S. Corp.*, 694 F.2d 609 (9th Cir. 1982).

In the present case, Plaintiff contends that the defendants participated in or facilitated the theft of the vehicles, deliberately concealed the theft, and purposely sabotaged Plaintiff's efforts to locate the vehicles after the theft. At a minimum, the defendants recklessly disregarded known dangers and deliberately or recklessly exposed the entrusted goods to unreasonable risks. These are not risks that one can reasonably anticipate in a contract of carriage or storage. Fraud, wrongful taking, conversion of the cargo, gross negligence, deliberate sabotage of efforts to recover the goods, failure and refusal to issue proper documentation, and deliberate exposure of the goods to unreasonable risks are unreasonable deviations that nullify limitations of liability found in COGSA, bills of lading, and published tariffs.

The defendants are not asking for summary judgment on Plaintiff's claims as such, only a determination that Plaintiff's damages are capped at $1,000, wherefore, Plaintiff need not at this time produce and file with the Court the extensive body of evidence it has accumulated to date that, at a minimum, generates a substantial dispute of material fact as to liability for all of the claims set forth in the complaint. The simple fact is that COGSA, bills of lading, and published tariffs do not limits a carrier's liability for fraud, conversion, recklessness, gross negligence, and other types of significant wrongdoing.

In reality COGSA, bills of lading, and published tariffs generally only limit liability for run-of-the-mill breach of contract and ordinary negligence. But only in certain circumstances, which are not present in this case.

The defendants' references to bills of ladings are inapposite in that they never issued any bills of lading for or with respect to the two vehicles in question. Indeed, they never even tried to issue any such bills of lading. This they admit.

COGSA's liability limitation is only effective if the shipper is afforded a "fair opportunity" to declare a value in excess of $500 and pay a corresponding charge. A fair opportunity requires that the shipper have notice of the liability limitations and have a fair opportunity to declare a higher value for the cargo. A carrier seeking to enforce the $500 limitation must establish that notice was given to a shipper through language contained in the bill of lading and the shipper was given an opportunity to opt out of the limitation. *See Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing*, 167 F.3d 99 (2d Cir. 1999); *MacSteel Int'l USA Corp. v. M/V IBN Abdoun*, 154 F.2d 826 (S.D.N.Y 2001); *Gen. Elec. Co. v. MV Nedlloyd*, 817 F.2d 1022 (2d Cir. 1987).

Notably, Empire's form for the "bill of lading" and Empire's "published tariff" also contain language consistent with COGSA to the effect that the COGSA limitation of liability of $500 applies but only if a higher value had not been declared by the shipper. In any event, though, COGSA's requirements control and prevail over both the bills of lading and the published tariffs.

Plaintiff has previously availed itself of the opportunity to declare a value in excess of $500. In the case at bar, Plaintiff was given no such opportunity and no opportunity to obtain insurance for the vehicles.

Furthermore, as the defendants correctly note, Plaintiff's vehicles were not converted when on board an ocean vessel. They were taken directly from the defendants' lot in New Jersey, before any voyage was booked, any bills of lading issued, or any tariffs or marine insurance were

negotiated or paid. Ultimately, this is a simple case of bailee liability for breach of contract, negligence, and various wrongful acts, not a maritime claim subject to any provisions of COGSA, bills of lading (which never existed), and published tariffs (which did not apply and were never charged in this case).

### 3. There is genuine dispute of material fact as to whether defendant Hitrinov is personally liable.

The complaint alleges that Empire is Hitrinov's *alter ego.* (Compl. ¶ 5.) Over the course of these proceedings, Hitrinov has produced no evidence that would disabuse Plaintiff of this conviction. According to Hitrinov, Empire never had any shareholders besides himself. Hitrinov apparently does not know how many shares the company is authorized to issue and how many it has issued (if any). Per Hitrinov, Empire never had a board of directors. (*See* Tr. Dep. Hitrinov, Ex. 2 at 98: "such institution was not created and was not implemented in our business.") Hitrinov has professed unfamiliarity with the concept of a company treasurer and/or secretary. (*See* Tr. Dep. Hitrinov, Ex. 2 at101 *et seq.*) He has claimed to have minutes of something or other but has failed to produce them despite request. (*See* Tr. Dep. Hitrinov, Ex. 2, at 90-105.)

Further, this action involves allegations of conversion, fraud, and unjust enrichment. It involves misrepresentations by defendant Hitrinov personally. Corporate forms can and should be pierced or disregarded when needed to prevent fraud or to achieve equity. *See Int'l Aircraft Trading Co. v. Manufacturers Trust Co.,* 297 N.Y. 285 (1948).

It should be added that, at this late hour, the defendants are trying to surreptitiously sneak something of a Rule 12(b)(6) motion into the last pages of the memorandum in support of their motion for summary judgment. This is improper and irregular. The time to make such a motion passed a long time ago, as the defendants were expressly admonished by Judge Bloom. If, for

some reason, it is determined that the allegations of fraud in the Complaint are somehow

deficient, Plaintiff should, at a minimum, be given leave to amend the fraud claims.

### Conclusion

The defendants' motion for partial summary judgment should be denied in its entirety.

Respectfully submitted,

OOO "Garant-S"
By Counsel

Dmitri A. Chernov, Esquire
11821 Parklawn Drive, Suite 206
Rockville, Maryland 20852
Telephone:    (240) 447-8625
E-mail:        DChernov@aol.com

Kostyantyn Nesterov, Esquire
11821 Parklawn Drive, Suite 206
Rockville, Maryland 20852
Telephone:    (703) 400-1316
E-mail:        Kosta.Nesterov@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify a true and correct copy of the foregoing was this __th day of August, 2012,

served on the following counsel via first class mail, postage repaid:

> Jon Werner, Esquire
> Lyons & Flood, LLP
> 65 West 36th Street, 7th Floor
> New York, NY 10018.

> Dmitri A. Chernov, Esquire
> 11821 Parklawn Drive, Suite 206
> Rockville, Maryland 20852
> Telephone:    (240) 447-8625
> E-mail:        DChernov@aol.com

> Kostyantyn Nesterov, Esquire
> 11821 Parklawn Drive, Suite 206
> Rockville, Maryland 20852
> Telephone:    (703) 400-1316
> E-mail:        Kosta.Nesterov@gmail.com