UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x **MEMORANDUM AND ORDER**
OOO "GARANT-S",                          Case No. 11-CV-1324 (FB)

                       Plaintiff,

       -against-

EMPIRE UNITED LINES CO., INC. and
MICHAEL KHITRINOV,

                    Defendants.
----------------------------------------------------------x


*Appearances:*
*For the Plaintiff:*
JON WERNER, ESQ.
Lyons & Flood LLP
65 West 36th Street, 7th Floor
New York, NY 10018

*For the Defendants:*
DMITRY A. CHERNOV
11821 Parklawn Drive, Suite 206
Rockville, MD 20852

**BLOCK, Senior District Judge:**

        Plaintiff OOO "Garant-S" has filed suit against defendants Empire United Lines

Co., Inc. ("Empire") and Michael Hitrinov ("Hitrinov") (collectively "defendants") for losses

arising from a third party's theft of plaintiff's automobiles.  Defendants move for partial

summary judgment limiting Empire's liability, and summary judgment on all claims alleged

against Hitrinov.  The parties appeared for oral argument on March 22, 2013.  For the below

reasons, defendants' motion is granted in full.

**I**

        The following facts, taken from the parties' Rule 56.1 statements, are undisputed

unless otherwise noted.  Where disputed, they are presented in the light most favorable to the

plaintiff.  *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

Plaintiff operates a business whereby it purchases used automobiles at auctions held in the United States and exports them to Kotka, Finland for sale.  Since 2008, plaintiff has engaged Empire to transport hundreds of vehicles per year to Finland.  Empire is a common carrier regulated by the Federal Maritime Commission, and coordinates the transportation of its clients' cargo from the United States to foreign countries by water.  As a licensed Ocean Transportation Intermediary and Non-Vessel Operating Common Carrier, Empire arranges for cargo to be delivered to one of its United States storage facilities, then retains ocean carriers to perform the actual overseas carriage.  Hitrinov is the President and sole shareholder of Empire.

On November 4, 2010, two of plaintiff's BMW vehicles ("vehicles") were delivered to Empire's storage facility in Elizabeth, New Jersey.  Four days later, thieves broke into the facility and stole four automobiles—including both of plaintiff's vehicles.  The next morning a security guard reported the thefts to the police, and Hitrinov thereafter filed police reports for each stolen vehicle.  Neither of plaintiff's vehicles has since been recovered.

Plaintiff then filed suit against Empire and Hitrinov for its related losses, alleging breach of contract, wrongful taking and conversion, fraud, negligence, gross negligence, promissory estoppel, negligent misrepresentation, and unjust enrichment.[1]  Defendants now move for partial summary judgment limiting Empire's liability to $1000 pursuant to the Carriage of Goods Sea Act, and summary judgment on all claims alleged against Hitrinov on

---

[1]Plaintiff also alleges a claim for detrimental reliance.  This is not an independent cause of action, but rather an element of plaintiff's promissory estoppel claim.  *See Adams v. Wash. Group, LLC*, 11 Misc.3d 1083(A), at *1 (Sup. Ct. Kings Co. 2006).

2

the basis of alter ego liability.

## II

### A.   Subject Matter Jurisdiction

As a preliminary matter, defendants contend that the Court lacks subject matter jurisdiction.  The complaint alleges diversity jurisdiction pursuant to 28 U.S.C. § 1332, and seeks $80,000 in compensatory damages.  Compl. ¶14.  Defendants contend that plaintiff's damages are limited to the amount plaintiff paid for the vehicles at auction, and thus fall below the $75,000 amount in controversy requirement.  The Court finds that plaintiff has sufficiently alleged the requisite amount for purposes of satisfying diversity jurisdiction.[2]  *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938) ("[T]he sum claimed by the plaintiff controls if the claim is apparently made in good faith.  It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."); *see also Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982) ("The jurisdictional determination is to be made on the basis of the plaintiff's allegations, not a decision on the merits.  Moreover, even where those allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted.").

### B.   Carriage of Goods Sea Act

Defendants first move for partial summary judgment limiting Empire's liability pursuant to the Carriage of Goods Sea Act ("COGSA").  46 U.S.C. § 30701 (note).  COGSA

---

[2]Because plaintiff's claims are governed by the Carriage of Goods Sea Act, 46 U.S.C. § 30701 (note), the Court also has jurisdiction under 28 U.S.C. § 1333.  *See Complaint of Tecomar S.A.*, 765 F. Supp. 1150, 1173 (S.D.N.Y. 1991).

applies "to all contracts for carriage of goods by sea between the ports of the United States and the ports of foreign countries." *Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing*, 167 F.3d 99, 100 (2d Cir. 1999) (per curiam). Where applicable, the statute limits a carrier's liability to "$500 per package . . . for any loss or damage to or in connection with the transportation of goods," unless a shipper otherwise declares a higher value prior to shipment. COGSA §4(5). Defendants contend that COGSA governs plaintiff's claims and limits Empire's liability to $500 per vehicle, or $1000 total.[3] Plaintiff argues that COGSA does not apply to the transaction, and that the statute's limitation of liability provisions are likewise inapplicable because it was denied a fair opportunity to declare a value in excess of $500 per vehicle. Plaintiff also claims that defendants' alleged participation in the thefts deprives Empire of COGSA's limitation of liability benefit. Plaintiff's arguments are without merit.

**1.     Whether COGSA Applies to Plaintiff's Claims**

COGSA normally "covers the period from the time when the goods are loaded on to the time when they are discharged from the ship." COGSA §1(e). However, the statute permits parties to expand the reach of its provisions beyond the time of loading and unloading. COGSA §7. A carrier's bill of lading provides evidence of such an agreement.[4] COGSA Introductory Note; *see also Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 29 (2004) (bill of

---

[3]Whether COGSA limits a carrier's liability is often resolved on summary judgment. *See, e.g., Prebena Wire Bending v. Transit Worldwide Corp.*, 1999 WL 1293473, at *2 (S.D.N.Y. June 2, 1999); *Ins. Co. of N. Am. v. Blue Star, Ltd.*, 1997 WL 345235, at *4 (S.D.N.Y. June 20, 1997).

[4]Subsequent to receiving a shipper's goods, a carrier "shall, on demand of the shipper, issue to the shipper a bill of lading" providing information including marks for identifying the goods, the number of packages or pieces received, and the condition of the goods. COGSA §3(c).

lading extended COGSA to cover the entire period in which the machinery would be under the carrier's responsibility).

Empire's house bills of lading incorporate COGSA by reference and expand the statute's coverage as follows:

> The Carrier undertakes responsibility from the place of receipt if named herein or from the port of loading to the port of discharge or the place of delivery if named hereto as follows: Where loss or damage has occurred between the time of receipt of the Goods by the Carrier at the port of loading and the time of delivery by the Carrier at the port of discharge, or during any prior or subsequent period of carriage by water, or where it cannot be established where the loss or damage occurred, the liability of the Carrier shall be determined in accordance with the provisions of the International Convention for the Unification of Certain Rules relating to Bills of Lading dated Brussels the 25th August, 1924 such as the Carriage of Goods by Sea Act 1924 of the United Kingdom, or where compulsorily applicable the Carriage of Goods by Sea Act of the United States 1936 or of like statutes of other countries. If anything herein contained be inconsistent with the said Acts or Laws it shall to the extent and on the occasion of such inconsistency and no further, be null and void.

Hitrinov Aff. Ex. 4. Thus, if COGSA applies to a given transaction, Empire's liability for loss or damage to related goods is limited to $500 per package unless the shipper has otherwise declared a higher value. If COGSA does not apply, Empire's liability is not subject to the $500 per package limitation.

Empire's house bills of lading identify the place of receipt as the company's storage facility in Elizabeth, New Jersey. Hitrinov Aff. Ex. 4; *see also* Hitrinov Aff. Ex. 2, Tariff Rule 8 Part 4. Empire's practice is to issue house bills of lading upon loading of the cargo onto an ocean carrier. Hitrinov Aff. ¶ 13. As acknowledged by counsel during oral argument, copies of these house bills of lading are thereafter electronically transmitted to a shipper.

Because plaintiff's vehicles were stolen prior to being loaded onto an ocean carrier, Empire had not yet issued bills of lading for the two vehicles.  Plaintiff argues that Empire's failure to do so precludes COGSA and its terms from applying to the transaction and the related claims.  This argument is unpersuasive.

"[I]t is not unusual to issue a bill of lading after a carrier has taken possession of cargo[,] and courts have regularly held that this does not prevent parties from being bound by its terms."  *Anvil Knitwear, Inc. v. Crowley Am. Transp., Inc.*, 2001 WL 856607, at *2 (S.D.N.Y. July 27, 2001); *see also Berkshire Knitting Mills v. Moore-McCormack Lines, Inc.*, 265 F. Supp. 846, 848 (S.D.N.Y. 1965) ("The fact that the bill of lading had not yet been issued, did not alter the contractual relationship of the parties.").  Rather, "[w]here a shipper has 'common business experience' with carriers such that it should know a carrier will issue a custom bill of lading, the [unissued] bill of lading applies to the transaction."  *Russul Corp. v. Zim Am. Integrated Shipping Servs.*, 2009 WL 3247141, at *3 (S.D.N.Y. Oct. 5, 2009) ("It is well-settled that as long as a bill of lading would have been issued in the ordinary course of business, the bill of lading serves as the contract governing the relationship of a shipper and carrier even if it was not actually issued.") (citation omitted).  Thus, where a shipper has knowledge as to the contents of a carrier's standard bill of lading, the parties may be bound by its terms even where a bill of lading has not been issued for the particular goods in question.  *See, e.g., Berkshire*, 265 F. Supp. at 848 ("The form of the bill of lading was concededly known, and as a matter of common business experience in transactions of this nature both parties must be deemed bound by the terms it contained."); *Garnay, Inc. v. M/V Lindo Maersk*, 816 F. Supp. 888, 894 (S.D.N.Y. 1993) (holding that bill of lading issued for two surviving containers governed a lost

container, provided that the issued bill of lading was the carrier's standard form bill of lading).

The evidence demonstrates that "prior to the thefts at issue in this case, [plaintiff] had an established business relationship with Empire, having shipped hundreds of automobiles a year with the assistance of Empire since 2008." 56.1 Statement ¶4; Compl. ¶¶ 9, 12; Lachinsky Aff. ¶9. During oral argument the parties confirmed that over the course of their business relationship, Empire had issued, and plaintiff had received, standard bills of lading containing the above-referenced language. Hitrinov Aff. ¶ 13, Ex. 4; Lachinsky Aff. ¶32. Plaintiff does not claim it was unaware of Empire's practice of issuing of bills of lading at the time of loading vehicles onto an ocean carrier. Additionally, the evidence contradicts plaintiff's assertion that it was somehow unaware of the terms contained in Empire's bills of lading—specifically the limited liability provision. Empire had advised plaintiff in 2008 that Empire was responsible for a maximum of up to $500 per vehicle in the event of damage or loss while vehicles were in its warehouse. At that same time Empire informed plaintiff that it could purchase additional insurance if more coverage was needed. Def.'s Reply Br. Ex. 1. Plaintiff concedes that it then purchased such additional coverage and paid a corresponding insurance premium. Lachinsky Aff. ¶ 30; Hitrinov Aff. Ex. 5.

Accordingly, the parties are bound by those standard terms contained in the bills of lading Empire would have issued to plaintiff upon the loading of its vehicles onto an ocean carrier. *See Berkshire*, 265 F. Supp. at 848 (parties bound by terms of unissued bill of lading incorporating COGSA, where bill of lading would have been issued upon loading of cargo onto vessel); *Mack Trucks, Inc. v. Farrel Lines, Inc.*, 1990 WL 3926, at *2 (S.D.N.Y. Jan. 16, 1990) (parties bound by terms of unissued standard bill of lading incorporating COGSA and

extending its provisions); *Russul Corp.*, 2009 WL 3247141, at *3 (unissued bill of lading incorporating COGSA was controlling, particularly in light of the "numerous prior shipments that had occurred between [the parties] with fully issued bills of lading . . . .").

Empire's house bills of lading provide that it undertakes responsibility for plaintiff's vehicles beginning at the time of their receipt at Empire's facility in Elizabeth, New Jersey.  Hitrinov Aff. Ex. 4.  From this point forward, COGSA's terms govern any loss or damage to the vehicles.  *Id.*  Because the vehicles were stolen subsequent to their delivery to Empire's facility, COGSA applies to the transaction underlying plaintiff's claims and limits Empire's liability accordingly.  *See* COGSA §§4(5), 7; Hitrinov Aff. Ex. 4; ¶ 24; 56.1 Statement ¶ 14; *see also Mack Trucks,*1990 WL 3926, at *2 (unissued bill of lading incorporating COGSA governed the parties' transaction and limited defendants' liability to $500).[5]

---

[5]While plaintiff now argues that it had not "booked" the two vehicles with Empire for transportation to Finland, both the evidence and plaintiff's own statements belie this contention.  First, plaintiff elsewhere acknowledges that it "booked" the two automobiles with Empire "to be transported from auctions sites in Ohio and Virginia to Kotka, Finland."  Pl.'s 56.1 Statement ¶3; *see also* Comp. ¶¶ 14, 42.  Defendants provide evidence that as a result of the parties' established course of dealing, they understood that unless otherwise specified, plaintiff's vehicles were to be transported to Finland and "the only information which needed to be provided in order to book an automobile for transportation was the year, make, model, color, vehicle identification number, and location of the automobile" where it was to be transported from.  Hitrinov Aff. ¶ 8. Plaintiff does not dispute that it sent this information for the two BMW vehicles to Empire via email on October 20, 2010 and October 21, 2010.  *See* Hitrinov Aff., Ex. 6. Upon receiving this information, Empire then arranged for plaintiff's two vehicles to be transported from their respective auction locations to its facility in Elizabeth, New Jersey, where the thefts occurred.  Hitrinov Aff. ¶¶ 9, 21-22.  Finally, the vast majority of plaintiff's claims rely upon its having "booked" the two vehicles with Empire for transportation to Finland.  *See, e.g.*, Comp. ¶¶ 25-26 (breach of contract claim alleging that the parties had an agreement for "the transportation of [the] two BMW vehicles [] to Kotka in Finland," and that plaintiff had "performed all of its obligations under the contract that it was required to perform."); ¶ 27(a) (defendants failed "to deliver the vehicles to the agreed destination [Finland]" and "return the vehicles to Plaintiff."); *see*

## 2.      Fair Opportunity

Plaintiff next argues that even if COGSA governs, the statute's limitation of liability provision is nonetheless inapplicable because it was denied a fair opportunity to declare a value in excess of $500 per vehicle.  This argument is likewise without merit.

"Under the 'fair opportunity' doctrine,[] the COGSA [$500 per package] limit is inapplicable if the shipper does not have a fair opportunity to declare higher value and pay an excess charge for additional protection."  *Nippon*, 167 F.3d at 101 (citing *Gen. Elec. Co. v. M.V. Nedlloyd*, 817 F.2d 1022, 1028 (2d Cir. 1987)); *see also* COGSA §4(5).  "Absent fair opportunity, a carrier loses the benefit of any limitation of liability to which it otherwise might be entitled."  *Gen. Elec.*, 817 at 1029.  In determining whether a shipper received such a fair opportunity, "[t]he carrier bears the initial burden . . .  [and] [p]rima facie evidence of that opportunity is established when it can be gleaned from the language contained in the bill of lading."  *Id.; see also Petition of Isbrandtsen Co.*, 201 F.2d 281, 285 (2d Cir. 1953).  If a carrier is able to demonstrate fair opportunity, "the burden of proof shifts to the shipper to demonstrate that a fair opportunity did not in fact exist."  *Gen. Elec.*, 817 at 1029.

A carrier may "establish prima facie evidence of fair opportunity by showing that bills of lading . . . specifically state that the shipper will have to declare excess liability in order to avoid the limitation and/or [] specifically incorporate COGSA by name in the bill of lading."  *MacSteel Int'l v. M/V IBN Abdoun*, 154 F. Supp. 2d 826, 833 (S.D.N.Y. 2001) ("[A]s a bare minimum, clear and unambiguous incorporation of COGSA by name in the bill of lading is sufficient to establish that the shipper had fair opportunity."); *see also Ins. Co. of N. Am. v.*

---

*also* Compl. ¶¶ 38(a-b), 64(a-b), 75 (a-b).

*M/V Xiang He*, 1990 WL 121587, at *4 (S.D.N.Y.1990) (finding that bill of lading satisfied fair opportunity test where it explicitly incorporated COGSA and specifically stated that shipper would have to declare excess value in order to avoid COGSA's liability limitations). Likewise, a carrier satisfies its prima facie burden where language in the bill of lading incorporates COGSA's provisions and provides space for a shipper to declare excess value. *See Gen. Elec.*, 817 at 1029 (carrier satisfied its burden where bill of lading incorporated COGSA by reference and provided a space for declaring excess value); *see also Nippon*, 167 F.3d at 101 (shipper received fair opportunity where the bill of lading limited liability to $500 per package and provided a space for stating a higher value).

The language contained in Empire's bill of lading is sufficient to satisfy its prima facie burden:

> In no event shall the Carrier be or become liable for any loss of or damage to or in connection with the Goods in an amount exceeding the limit per package or unit . . . provided for by the United States Carriage of Goods by Sea Act, Section 4(5) or by any similar act in force according to the provisions of clause 4 unless the nature and value of such goods have been declared by the Shipper before shipment, agreed by the Carrier, inserted in the Bill of Lading and moreover freight paid on "ad valorem" basis.

Hitrinov Aff. Ex. 4, BOL Clause 5. Thus, plaintiff must "demonstrate that a fair opportunity did not in fact exist." *Gen. Elec.*, 817 at 1029. While plaintiff maintains that it was deprived of a fair opportunity to declare excess value, it provides no evidentiary support for this conclusion.[6] Moreover, plaintiff does not contend that it "even desired to make such a declaration." *Xiang He*, 1990 WL 121587, at *4 (granting defendant's motion for partial

---

[6]During oral argument plaintiff remained unable to identify evidentiary support demonstrating that it was deprived of a fair opportunity to declare excess value.

summary judgment limiting liability under COGSA where plaintiff failed to provide "any evidence showing that a fair opportunity . . . did not in fact exist . . . ."). As plaintiff has not met its burden of showing that a fair opportunity did not exist, COGSA's limitation of liability provision applies. *See id.; Assoc. Metals & Minerals Corp. v. M/V Olympic Mentor*, 1995 WL 794062, at *12 (S.D.N.Y. Dec. 20, 1995) (finding COGSA's $500 limitation applied where plaintiff "presented no evidence that [fair opportunity] did not exist."); *Goga v. Zim Am. Integrated Shipping Servs. Co.*, 2008 WL 2875059, at *6-7 (S.D.N.Y. July 25, 2008) (granting defendant's motion for partial summary judgment limiting liability to $500 where plaintiff failed to offer "any evidence that [an intermediary] did not have a fair opportunity to declare excess value . . . .").

## 3.   Unreasonable Deviation

Finally, plaintiff contends that COGSA's limitation of liability provision does not apply because defendants engaged in "unreasonable deviations that nullify [the] limitations of liability found in COGSA." Specifically, plaintiff argues that defendants "participated in or facilitated the theft of the vehicles, deliberately concealed the theft, and purposely sabotaged Plaintiff's efforts to locate the vehicles after the theft." Pl.'s Opp'n Br. at 11.

While it is true that certain "unreasonable deviations" may deprive a carrier of COGSA's benefits, *B.M.A. Indus. v. Nigerian Star Line, Ltd.*, 786 F.2d 90, 91 (2d Cir. 1986), the Second Circuit has specifically limited the doctrine "to two situations: geographic deviation and unauthorized on-deck stowage." *Sedco, Inc. v. S.S. Strathewe*, 800 F.2d 27, 31 (2d Cir. 1986) (citing *B.M.A.*, 786 F.2d at 91-92; *Italia di Navigazione, S.p.A v. M.V. Hermes I*, 724 F.2d 21 (2d Cir. 1983)). Neither of these situations is present here. Furthermore, the Second Circuit has

pointedly refused to extend the unreasonable deviation doctrine to include "corrupt or criminal" acts. *See B.M.A.*, 786 F.2d at 91-92 (refusing to find an unreasonable deviation where plaintiff "alleged criminal receipt of a bribe in connection with [] misdelivery"); *see also Hermes I*, 724 F.2d at 22 (holding that "systematic thefts" by a carrier's officers did not constitute an unreasonable deviation); *Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhauser*, 507 F.2d 68, 71-72 (2d Cir. 1974) (refusing to expand the doctrine to include "gross negligence or wanton and wilful misconduct in tendering an unseaworthy ship."). Plaintiff therefore has not demonstrated that defendants' actions constituted an unreasonable deviation such that the latter should be deprived of COGSA's limitation of liability provisions.

**C.     Hitrinov's Individual Liability**

Defendants also move for summary judgment on plaintiff's claims alleged against Hitrinov in his individual capacity. Plaintiff asserts that Hitrinov is personally liable for its losses because Empire was Hitronov's alter ego. Compl. ¶ 5. However, plaintiff fails to provide evidence sufficient to pierce the corporate veil.

A party seeking to pierce the corporate veil, and thereby impose personal liability on an owner, must demonstrate that the corporation "has been used to achieve fraud, or . . . been so dominated by an individual . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego." *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) ("New York courts disregard corporate form reluctantly."). In making this determination, the following factors are relevant: "[T]he intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records,

failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.*, 98 F.3d 13, 18 (2d Cir. 1996). Importantly, the Second Circuit has recognized that "with respect to small, privately-held corporations, 'the trappings of sophisticated corporate life are rarely present,' and we must avoid an over-rigid 'preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history'." *Id.* (quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-01 (2d Cir.1989)).

Plaintiff has not provided any evidence that Hitrinov "so dominated" Empire that the corporation could be called his alter ego. While plaintiff points to evidence that Hitrinov was Empire's sole shareholder, "[c]ontrol through 100% stock ownership does not in itself constitute a[n] [individual] the alter ego of the [corporation]." *Bellomo v. Pa. Life Co.*, 488 F. Supp. 744, 745 (S.D.N.Y. 1980); *see also Tycoons Worldwide Group Pub. Group*, 721 F. Supp. 2d 194, 206-206 (S.D.N.Y. 2010) (finding fact that individual was the President and majority owner of the company was not "in itself, a basis for piercing the corporate veil.") (citing sources). And while plaintiff points to Hitrinov's statements that he did not know how many shares Empire was authorized to issue, nor how many shares were issued upon incorporation, this lack of knowledge is again an insufficient basis to pierce the corporate veil. *See United States v. Hued*, 1992 WL 346877, at *3 (S.D.N.Y. Nov. 10, 1992) (granting summary judgment on alter ego claims where plaintiff argued for veil piercing because defendant could not recall if the corporation had ever issued an annual report).

Although plaintiff seeks to rely upon Hitrinov's "unfamiliarity with the concept

13

of a company treasurer and/or secretary," Pl.'s Opp'n Br. at 13, the evidence demonstrates that this is due to Hitrinov's limited grasp of the English language.  *See* Lachinsky Aff. Ex. 2, Hitrinov Dep. 100-05.  The evidence establishes that Empire was a "small company," where Hitrinov and Empire's employees shared responsibility for a number of tasks, including maintenance of the company's books and records.  *Id.* at 100-05 ("Each and everyone d[id] everything.").  Thus, while Empire may not have observed many of the formalities common to a larger company, this lack of corporate formalities again does not provide a basis for holding Hitrinov personally liable.  *See Bridgestone/Firestone,* 98 F.3d at 18 ("[W]ith respect to small, privately-held corporations . . . we must avoid an over-rigid preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history.").

Importantly, there is no evidence that Hitrinov intermingled Empire's corporate funds with his own, used the company's corporate funds for his own purposes, failed to maintain adequate books and records, or otherwise used Empire "to further personal rather than corporate ends."  *See Tycoons*, 721 F. Supp. 2d at 206 (finding a similar lack of evidence required granting summary judgment on alter ego claims); *see also Primex Plastics Corp. v. Lawrence Prods. Inc.*, 1991 WL 183367, at *6-7 (S.D.N.Y. Sept. 12, 1991) (dismissing alter ego claim where the alleged facts did not suggest that the corporation "was a 'dummy' corporation" for the individual).  As plaintiff has not established a basis for piercing the corporate veil, summary judgment is granted on the claims alleged against Hitrinov on the basis of alter ego liability.

### III

Defendants' motion for partial summary judgment limiting Empire's liability is

granted; defendants' motion for summary judgment on the claims alleged against Hitrinov

is also granted.  This case will be dismissed upon defendants' notifying the Court that they

have tendered $1000 to plaintiff.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 29, 2013